UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TRUSTEES OF THE OPERATING
ENGINEERS' LOCAL 324
PENSION FUND, et al.,

        Plaintiffs,

vs.

Case No. 21-CV-11080

HON. GEORGE CARAM STEEH

TRI-CITY GROUNDBREAKERS,
INC, and EDW. C. LEVY CO. d/b/a
ACE-SAGINAW, PAVING CO.,

        Defendants.
_____/

ORDER GRANTING DEFENDANT ACE-SAGINAW'S MOTION
FOR SUMMARY JUDGMENT (ECF No. 26), GRANTING IN PART AND
DENYING IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
(ECF No. 30) AND DENYING DEFENDANT TRI-CITY'S MOTION TO
DISMISS AND/OR FOR SUMMARY JUDGMENT (ECF No. 32)

This is an action to collect delinquent fringe benefit contributions related to work on a state road construction project. The lawsuit was filed by the trustees of multiemployer fringe benefit trust funds. Defendants are a contractor and a subcontractor, one of whom plaintiffs contend is responsible under ERISA or contract theories for payment of the delinquent

- 1 -

contributions. The matter is before the Court on cross-motions for summary judgment filed by each of the three parties to the lawsuit.

## FACTUAL BACKGROUND

Plaintiffs are the trustees of six multiemployer Taft-Hartley fringe benefit funds ("Funds"), including both pension/retirement and welfare funds. The Funds are sponsored by the International Union of Operating Engineers Local 324 ("Union") and a number of industry employer associations ("Employer Associations"). The Union represents the interests of heavy machine operators working in the road construction industry.

The trustees administer the Funds pursuant to the terms and provisions of the Funds' respective Agreements and Declarations of Trust. The Funds were established pursuant to a collective bargaining agreement previously entered into between the Union and certain employers and Employer Associations. The Funds are required to be maintained and administered in accordance with the provisions of the LMRA, ERISA and other applicable state and federal laws.

Defendant Tri-City Groundbreakers, Inc. ("Tri-City") is a road construction contractor and was the prime contractor for a project with the Michigan Department of Transportation ("Project"). Tri-City is a member of

the Michigan Union Contractors Group ("MUCG") and is a signatory party to the "Highway, Bridge and Airport Agreement" between MUCG and the Union with a term of April 1, 2019 to May 31, 2024 ("CBA"). Pursuant to the CBA, Tri-City agreed to make employee fringe benefit contributions to the Funds for each employee employed by Tri-City and covered by the CBA.

Article IX (a) of the CBA addresses contractors' obligations related to subcontracting agreements. A contractor is required to obtain the agreement of any subcontractors to comply with all terms and conditions, including fringe benefit contributions, of the CBA:

> The Contractor expressly agrees that in the event he subcontracts any work covered by this Agreement, to be performed on the job site, he will not so subcontract with any subcontractor unless the subcontractor agrees that in the performance of the work he will comply with all the rates, terms and conditions and fringe benefit contributions of this Agreement, except Article III.

Article IX (b) contains a disclaimer, providing that the contractor "shall not be liable for any subcontractor who becomes party to this Agreement . . . ."

On May 6, 2020, defendant Edw. C. Levy Co. d/b/a Ace-Saginaw Paving Company ("Ace-Saginaw") submitted a bid sheet to Tri-City quoting asphalt paving work on a portion of the Project known as Eastman Road in

Midland, Michigan. Ace-Saginaw's bid sheet included the following paragraph under the heading: "DISCLAIMER OF UNION BENEFIT PLAN CONTRIBUTION LIABILITY".

> NOTWITHSTANDING ANY TERM OR PROVISION IN THIS QUOTE OR THE BID PACKAGE TO THE CONTRARY, ACE-SAGINAW PAVING COMPANY SHALL NOT, UNDER ANY CIRCUMSTANCES, AGREE TO MAKE ANY CONTRIBUTIONS TO ANY OF THE OPERATING ENGINEERS' FRINGE BENEFIT PLANS, INCLUDING, WITHOUT LIMITATION, THE OPERATING ENGINEERS' LOCAL 324 PENSION PLAN ("PLAN"). IF AWARDED THIS WORK, A CONDITION TO ACE-SAGINAW ACCEPTING THIS AWARD SHALL BE THAT THE CONTRACTOR REPRESENT AND AGREE THAT THE SUBCONTRACT/PURCHASE ORDER SHALL NOT REQUIRE ACE-SAGINAW TO MAKE ANY CONTRIBUTIONS TO ANY OF THE OPERATING ENGINEERS' FRINGE BENEFIT PLANS, INCLUDING WITHOUT LIMITATION, TO THE PLAN.

Ace-Saginaw quoted the prices in its bid sheet premised on its disclaimer of fringe benefit contribution liability. Decl. Nathan Gotts, ¶ 8.

On May 18, 2020, Tri-City entered into a subcontracting agreement with Ace-Saginaw ("Subcontract"). The Subcontract consists of a form MDOT subcontract and Attachment "A," entitled "Terms and Conditions," which was drafted by Tri-City. The Subcontract includes the prices Ace-Saginaw quoted in its bid sheet for labor, materials, equipment and supervision.

The first paragraph of the Subcontract indicates that it is a fully integrated agreement:

1. These Conditions of Subcontract are added to and made part of the attached Subcontract between Tri-City Groundbreakers (TCGB) and Subcontractor and which, taken together, may be collectively referred herein as this agreement or this Subcontract. This Subcontract constitutes the entire agreement between TCGB and subcontractor and supersedes any and all prior written or oral agreements, understandings, quotes or proposals between or by TCGB or Subcontractor in connection with the project or work provide for herein. TCGB shall not be bound by or liable for any statement, representation, promise, inducement or understanding of any kind or nature not set forth herein. No changes, amendments or modifications of any of the terms and conditions hereof shall be valid unless made in writing and signed by the party to be charged.

Paragraph 21 of the Terms and Conditions relates to work falling under the jurisdiction of a CBA between Tri-City and a union, and provides that the Subcontractor will comply with the "rates, terms and conditions" of the CBA:

21. In the event that work is performed pursuant to a Subcontract that otherwise would fall within the work jurisdiction and scope of a collective bargaining agreement in force presently between [Tri-City] and a union, Subcontractor agrees that it will comply with all rates, terms and conditions of such collective bargaining agreement, a copy of which shall be provided upon request. . . .

- 5 -

The work performed by Ace-Saginaw under the Subcontract fell within the work jurisdiction of the CBA. Ace-Saginaw did not make fringe benefit contributions to the Funds in relation to work its employees performed on the Project.

Ace-Saginaw is not a signatory to the CBA. Ace-Saginaw and the Union were parties to the "Road Agreement," a predecessor CBA, which expired on June 1, 2018. At that time, Ace-Saginaw's obligation to make contributions to the Funds for post-expiration work its employees performed ceased. Ace-Saginaw explains that for a brief time it negotiated with the Union for a successor CBA and continued to contribute to the Funds during those negotiations. However, Ace-Saginaw and the Union ended their negotiations in December 2018 without a successor CBA and the Funds stopped accepting Ace-Saginaw's contributions. Ace-Saginaw formally withdrew from participation in the Funds, and the Union assessed and collected withdraw liability from Ace-Saginaw under ERISA's withdrawal liability rules.

The Union then petitioned the National Labor Relations Board to hold a "representation election," whereby Ace-Saginaw employees could require Ace-Saginaw to negotiate with Local 324 by electing Local 324 as their

exclusive bargaining representative. Local 324 lost the election. Ace-Saginaw is now a non-union contractor that provides its employees with benefits through its own employer-sponsored benefit plans.

On October 5, 2020, the Union filed a grievance against Tri-City, accusing them of being in violation of the CBA by subcontracting with Ace-Saginaw, who has not complied with the rates, terms and conditions, and fringe benefit contributions of Article IX. The Union demanded that Tri-City cease and desist subcontracting in violation of Article IX and that the fringe benefit funds be made whole. Tri-City responded to the Union on December 22, 2020, requesting that the grievance be dismissed because Tri-City was not in breach of the CBA. Tri-City referred to language from the Subcontract purporting to show that it had a contractual commitment from Ace-Saginaw to comply with the CBA to the extent required by Article IX. Tri-City also argued that Article IX does not make Tri-City liable for Ace-Saginaw's failure to comply with its obligations under the Subcontract.

On February 10, 2021, The Union withdrew its grievance against Tri-City without prejudice. On February 19, 2021, the Funds sent a letter to Ace-Saginaw reminding it of its obligations and requesting that contributions be made. Ace-Saginaw contends that it is not obligated to

make fringe benefit contributions based on pre-contract documents it entered with Tri-City.

The Funds filed this lawsuit against Tri-City and Ace-Saginaw, seeking fringe benefit contributions for the work Ace-Saginaw's non-union employees performed under the Subcontract on three theories. Count I alleges breach of the CBA against Tri-City and Ace-Saginaw pursuant to ERISA § 515. Counts II and III allege breach of contract by Ace-Saginaw pursuant to LMRA § 301(a), 29 U.S.C. § 185, and under state law.

The Funds move for summary judgment, arguing that Ace-Saginaw is responsible under ERISA for payment of the delinquent contributions, pursuant to the terms of the Subcontract. However, if the Court finds that Ace-Saginaw is not liable, then the Funds argue that Tri-City is necessarily liable for breach of its obligation under the CBA to ensure that its subcontractors comply with all of the CBA's provisions.

In its motion to dismiss or for summary judgment, Tri-City argues that it honored the terms of Article IX (a) of the CBA when it subcontracted with Ace-Saginaw and obtained Ace-Saginaw's agreement to comply with the rates, terms, conditions and fringe benefit contributions of the CBA.

Moreover, Tri-City argues there is no language in Article IX which contractually obligates it to make contributions to the Funds for the benefit of Ace-Saginaw's employees because of Ace-Saginaw's failure to pay its required fringe benefit contributions.

In its motion for summary judgment, Ace-Saginaw argues that Article IX (a) of the CBA requires signatories like Tri-City to subcontract only with subcontractors that agree to "comply with all the rates, terms and conditions *and fringe benefit contributions*" of the CBA. However, Ace-Saginaw argues it did not agree to pay fringe benefit contributions.

## STANDARD FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *See Redding v. St. Eward*, 241 F.3d 530, 532 (6th Cir. 2001).  The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice.  The procedure is not a disfavored procedural shortcut.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986);

see also *Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).

The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Amway Distributors Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. *Tolan v.* Cotton, 572 U.S. 650, 660 (2014); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Redding*, 241 F.3d at 532 (6th Cir. 2001). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original); *see also National Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to

judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 270 (1968); *see also McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party. *Anderson*, 477 U.S. at 248, 252. Rather, there must be evidence on which a jury could reasonably find for the non-movant. *McLean*, 224 F.3d at 800 (*citing Anderson*, 477 U.S. at 252).

## RULE 12(b)(6) DISMISSAL STANDARD

Rule 12(b)(6) allows the Court to make an assessment as to whether the plaintiff has stated a claim upon which relief may be granted. Under the Supreme Court's articulation of the Rule 12(b)(6) standard in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 554-56 (2007), the Court must construe the complaint in favor of the plaintiff, accept the allegations of the complaint as true, and determine whether plaintiff's factual allegations present plausible claims. "'[N]aked assertion[s]' devoid of 'further factual enhancement'" are insufficient to "state a claim to relief that is plausible on its face". *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550

U.S. at 557, 570). To survive a Rule 12(b)(6) motion to dismiss, plaintiff's pleading for relief must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *D'Ambrosio v. Marino*, 747 F.3d 378, 383 (6th Cir. 2014) (quoting *Twombly*, 550 U.S. at 555) (other citations omitted). Even though the complaint need not contain "detailed" factual allegations, its "factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true." *New Albany Tractor, Inc. v. Louisville Tractor, Inc.*, 650 F.3d 1046, 1051 (6th Cir. 2011) (*citing Twombly*, 550 U.S. at 555).

## ANALYSIS

Count I of the Complaint asserts an action for breach of the CBA by Tri-City and Ace-Saginaw. ERISA § 515 provides when there is a statutory obligation to contribute to a multiemployer plan:

> Delinquent contributions
>
> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

29 U.S.C. § 1145. ERISA § 515 obligations are enforceable by plan trustees pursuant to ERISA's civil enforcement provisions at 29 U.S.C. § 1132, which permit trustees of a multiemployer plan to bring a civil action to enforce the terms of a plan or an ERISA obligation. *See* 29 U.S.C. § 1132(a)(2) & (a)(3). Count I also alleges a claim for breach of the CBA pursuant to the Court's jurisdiction under LMRA § 301(a), 29 U.S.C. § 185.

The fundamental requirement for a binding obligation to contribute to a multiemployer fund, under both ERISA and the LMRA, is a written agreement setting forth the contribution obligation. *See Cent. States, Se. & Sw. Areas Pension Fund v. Behnke, Inc.*, 883 F.2d 454, 459 (6th Cir. 1989); LMRA § 302(c)(5)(B); 29 U.S.C. § 1102(a). The trustees argue that the Subcontract, which adopts certain terms of the CBA, is a sufficient written agreement to support Ace-Saginaw's ERISA contribution obligation. Alternatively, the trustees argue that if the Court finds Ace-Saginaw is not obligated to pay fringe benefit contributions, then Tri-City must pay the contributions under the CBA.

In counts II and III, the trustees, as third-party beneficiaries, allege breach of contract claims against Ace-Saginaw for violating its obligations under the Subcontract.

I.     Liability of Ace-Saginaw

For the trustees to enforce ERISA's § 515 statutory contribution obligation against Ace-Saginaw for fringe benefits, they must first establish that Ace-Saginaw undertook such obligation. "Where the words of a contract in writing are clear and unambiguous, its meaning is to be ascertained in accordance with its plainly expressed intent." *See M & G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 435 (2015) (quoting 11 R. Lord, Williston on Contracts § 30:6, p. 108 (4th ed. 2012) (internal quotation marks omitted)).

Here, Ace-Saginaw agreed that it would comply with the rates, terms and conditions in the CBA. Subcontract, ¶ 21. The Subcontract's silence on fringe benefit contributions is significant. Courts cannot infer that a contract provides benefits as to which the contract is silent. *Id*. Even if the Court found a latent ambiguity in the meaning of the Subcontract language, which it does not, the extrinsic evidence in this case supports Ace-Saginaw's position that the parties did not intend that it be obligated to pay fringe benefits. The CBA distinguishes between rates, terms and conditions and fringe benefits, yet Tri-City did not include fringe benefits in the language of the Subcontract. This is also consistent with the fact that Ace-Saginaw

disclaimed fringe benefit obligations in the bid sheet it submitted to Tri-City. Finally, the fact that Ace-Saginaw withdrew from participation in the Funds and became a non-union contractor supports its position that it did not agree to pay fringe benefit contributions.

Because Ace-Saginaw did not agree to comply with the fringe benefit contributions of the CBA, the trustees' attempt to collect such contributions from Ace-Saginaw under ERISA fails. Nor can the trustees succeed on their breach of contract claims where the Subcontract does not obligate Ace-Saginaw to pay fringe benefits.

II.     Liability of Tri-City

The CBA provides that Tri-City may not subcontract any work covered by the CBA "unless the subcontractor agrees that in the performance of the work he will comply with all the rates, terms and conditions *and fringe benefit contributions* of this Agreement[.]" Article IX (a) (emphasis added). Tri-City argues that it honored the terms of Article IX (a) of the CBA by obtaining Ace-Saginaw's agreement to comply with the rates, terms, conditions, and fringe benefit contributions of the CBA. However, the language included in the Subcontract – requiring Ace-Saginaw's compliance with the rates, terms and conditions of the CBA –

does not include compliance with fringe benefit contributions. Subcontract, ¶ 21. Tri-City's repeated assertions that it obtained Ace-Saginaw's agreement to comply with the fringe benefit contributions of the CBA are not supported by the unambiguous language of the Subcontract. "Where the words of a contract in writing are clear and unambiguous, its meaning is to be ascertained in accordance with its plainly expressed intent." *M & G Polymers USA, LLC,* 574 U.S. at 435 (quoting 11 R. Lord, Williston on Contracts § 30:6, p. 108 (4th ed. 2012) (internal quotation marks omitted)). The Court's reasoning is further discussed above in relation to Ace-Saginaw's obligations under the Subcontract.

Tri-City next argues that there is no language in Article IX of the CBA which contractually obligates it to make contributions to the Funds because of Ace-Saginaw's failure to pay its required fringe benefit contributions. However, Tri-City's liability in this case is not based on its assumption of the obligations of the subcontractor. In fact, the Court found that Ace-Saginaw does not have any fringe benefit obligations under the Subcontract. Rather, Tri-City's liability is based on its own breach of Article IX (a) of the CBA for not obligating its subcontractor to comply with the fringe benefit contribution requirements of the CBA.

Tri-City breached its duty under the CBA to ensure that its subcontractor agreed to all rates, terms and conditions, *and fringe benefit contributions* of the CBA. Case law holds that the general contractor is liable in damages to the funds for such breaches of the CBA, measured by the contributions and related amounts due and owing based on the hours worked by its subcontractor. *See, Walsh v. Schlecht*, 429 U.S. 401 (1977) (subcontractor provision in CBA interpreted as requiring payments to be made solely for the benefit of employees of signatory contractors with those benefits being measured by the hours worked by employees of non-signatory subcontractors); *Trustees of Teamsters Const. Workers Loc. No. 13, Health & Welfare Tr. Fund for Colorado v. Hawg N Action, Inc.*, 651 F.2d 1384, 1387 (10th Cir. 1981) ("The defendant argues that though it agreed to require any subcontractor to make payments into the trust funds, it did not agree to make such payments if the subcontractor failed to do so. In this manner, the defendant attempts to distinguish this case from *Walsh v. Schlecht*. We are not impressed with this attempted distinction. To accept this particular argument would mean that the trustees would have no remedy for defendant's undisputed breach of contract"); *Trustees of Sheet Metal Workers' Loc. Union No. 80 Pension Tr. Fund v. MJ Mech.*

*Servs., Inc.*, 2014 WL 5307605, at *8 (E.D. Mich. Oct. 16, 2014) ("this Court shall require Defendant to make contributions based on the subcontractor work as if 'the agreement between the defendant and the union had been fully performed'").

Tri-City attempts to distinguish these cases by arguing that it complied with the subcontracting obligations of the CBA by obtaining Ace-Saginaw's agreement to pay fringe benefit contributions. However, as discussed above, the unambiguous language of the Subcontract failed to bind Ace-Saginaw, meaning that Tri-City did not in fact comply with its subcontracting obligations contained in the CBA.

Tri-City is also not saved by the disclaimer of signatory employer liability contained in the CBA. Article IX (b) provides that the contractor "shall not be liable for any subcontractor who becomes party to this Agreement . . . ." This provision only relieves a contractor from liability as to subcontractors who are signatories to the CBA. Ace-Saginaw is not a signatory to the CBA.

The Court finds that Tri-City is liable for damages to the funds for breach of the CBA.

III. Damages

To place the Funds in the position they would have been had Tri-City not breached the terms of the CBA, damages are measured by the contributions and related amounts due and owing based on the hours worked by its subcontractor.

The Funds' Fringe Fund Director calculated the amount of the contributions owing as a result of Ace-Saginaw's employees' work on the Project as $24,582.55. Decl. Tim Lalonde, ¶ 13 and Ex. 1. This calculation does not include additional amounts required under the Funds' Collection Policy and ERISA, 29 U.S.C. 1132(g)(2), such as liquidated damages, interest and collection expenses. Ace-Saginaw maintains that its employees performed only 344 hours of work under the Subcontract that, were it signatory, would have been covered under the CBA. Decl. Jason Reinhardt, ¶ 14.

The Court finds there are issues of material fact as to damages, making summary judgment as to damages premature.

## CONCLUSION

For the reasons stated above,

IT IS HEREBY ORDERED that defendant Ace-Saginaw's motion for summary judgment (ECF No. 26) is GRANTED. Ace-Saginaw is dismissed from this action.

IT IS HEREBY FURTHER ORDERED that plaintiffs' motion for summary judgment (ECF No. 30) is DENIED as to Ace-Saginaw and GRANTED on liability only as to Tri-City.

IT IS HEREBY FURTHER ORDERED that defendant Tri-City's motion for summary judgment or to dismiss (ECF No. 32) is DENIED.

So ordered.

Dated:  February 9, 2023

s/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

---

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on February 9, 2023, by electronic and/or ordinary mail.

s/Lisa Bartlett
Deputy Clerk

---